UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JACOBS ENGINEERING GROUP, INC._, et al._, <br><br>Plaintiffs, <br><br>v. <br><br>CAPEFIRST FUNDING, LLC, _et al._, <br><br>Defendants. <br><br>CAPEFIRST FUNDING, LLC, et al., <br><br>Counter-Plaintiffs, <br><br>v. <br><br>JACOBS ENGINEERING GROUP, INC._, et al._, <br><br>Counter-Defendants | Case No. 1:18-cv-1302-CMH/TCB |

**ANSWER AND COUNTERCLAIM OF CAPEFIRST FUNDING, LLC
AND INVESTOR RECOVERY TRUST, CAPEFIRST ADVISORS, LLC, TRUSTEE**

Defendants Capefirst Funding, LLC ("Capefirst") and Investor Recovery Trust, Capefirst Advisors, LLC, Trustee ("IRT" and with Capefirst, "CF Parties"), by their attorneys answer the Complaint for Interpleader ("Complaint") filed by Plaintiffs Jacobs Engineering Group Inc. ("Jacobs") and Blue Canopy Group LLC ("Blue Canopy") (collectively, "Plaintiffs") and bring this Counterclaim against Plaintiffs as follows.

**ANSWER**

**INTRODUCTION**

1. CF Parties admit the allegations in paragraph 1 of the Complaint.

2. CF Parties deny the allegations in paragraph 2 of the Complaint.

3. CF Parties deny the allegations in paragraph 3 of the Complaint.

4. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 4 of the Complaint and therefore deny the same.

5. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 5 of the Complaint and therefore deny the same.

6. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 6 of the Complaint and therefore deny the same.

7. CF Parties admit the allegations in paragraph 7 of the Complaint.

8. CF Parties admit the allegations in paragraph 8 of the Complaint except to the extent that the agreement described therein speaks for itself.

9. CF Parties admit the allegations in paragraph 9 of the Complaint.

10. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 10 of the Complaint and therefore deny the same.

11. Paragraph 11 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, CF Parties deny the allegations in paragraph 11 of the Complaint.

## PARTIES

12. CF Parties admit paragraph 12 of the Complaint.

13. CF Parties admit paragraph 13 of the Complaint.

14. CF Parties admit paragraph 14 of the Complaint.

15. CF Parties admit paragraph 15 of the Complaint.

16. CF Parties admit paragraph 16 of the Complaint.

17. CF Parties admit paragraph 17 of the Complaint.

18. CF Parties admit paragraph 18 of the Complaint.

19. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 19 of the Complaint and therefore deny the same.

20. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 20 of the Complaint and therefore deny the same.

21. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 21 of the Complaint and therefore deny the same.

## JURISDICTION AND VENUE

22. Paragraph 22 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, CF Parties deny the allegations in paragraph 22 of the Complaint.

23. Paragraph 23 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, CF Parties deny the allegations in paragraph 23 of the Complaint.

24. Paragraph 24 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, CF Parties deny the allegations in paragraph 24 of the Complaint.

25. Paragraph 25 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, CF Parties deny the allegations in paragraph 25 of the Complaint.

## STATEMENT OF INTERPLEADER ACTION

### Nature of the Property

26. CF Parties admit the allegations in paragraph 26 of the Complaint.

27. CF Parties deny the allegations in paragraph 27 of the Complaint.

28. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 28 of the Complaint and therefore deny the same.

**Competing Claims and Potential Claims against the $1,933,500 Fund**

29. CF Parties admit the allegations in Paragraph 29 of the Complaint.

30. CF Parties lack sufficient knowledge to respond to the allegations in paragraph 30 of the Complaint and therefore deny the same.

31. Paragraph 31 of the Complaint contains legal conclusions to which no responses is necessary. In addition, the Fairfax Complaint described therein speaks for itself. To the extent that a response is necessary, CF Parties deny the allegations in paragraph 31 of the Complaint.

32. CF Parties admit the allegations in paragraph 32 of the Complaint.

33. CF Parties deny the allegations in paragraph 33 of the Complaint.

34. CF Parties deny the allegations in paragraph 34 of the Complaint.

35. CF Parties deny the allegations in paragraph 35 of the Complaint.

36. CF Parties deny the allegations in paragraph 36 of the Complaint.

37. CF Parties deny the allegations in paragraph 37 of the Complaint.

38. To the extent that any of the allegations contained in the Complaint are not specifically admitted or denied, they are hereby denied.

**AFFIRMATIVE DEFENSES**

1. CF Parties have the defense of estoppel.

2. CF Parties have the defense of failure of consideration.

3. CF Parties have the defense of fraud.

4. CF Parties have the defense of illegality.

5. CF Parties have the defense of laches.

6. CF Parties have the defense of res judicata.

7. CF Parties have the defense of the statute of limitations.

8. All or some of the claims are barred by the conduct of Plaintiffs.

9. The Court should abstain from considering this matter pursuant to the doctrines announced by the United States Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) and *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

CF Parties reserve the right to assert additional defenses upon discovery of further information containing the matters at issue in the Complaint.

WHEREFORE, Defendants Capefirst Funding, LLC and Investor Recovery Trust, Capefirst Advisors, LLC, Trustee respectfully request that the Court enter judgment in their favor and against Plaintiffs and award Defendants Capefirst Funding, LLC and Investor Recovery Trust, Capefirst Advisors, LLC, Trustee the stake presently held in the Court registry, together with statutory prejudgment interest pursuant to Va. Code Ann. § 8.01-382 and applicable law, and their attorneys' fees, costs and expenses incurred in connection with this case, and such other relief as the Court deems necessary and appropriate.

### COUNTERCLAIM OF CAPEFIRST FUNDING, LLC AND INVESTOR RECOVERY TRUST, CAPEFIRST ADVISORS, LLC, TRUSTEE

Counter-Plaintiffs (a) Investor Recovery Trust, Capefirst Advisors, LLC, Trustee ("IRT"), and (b) Capefirst Funding, LLC ("Capefirst" and with IRT, "Counter-Plaintiffs"), by their attorneys and as assignees of Westfields Holdings LLC ("Westfields") and real parties in interest,

sue Blue Canopy Group, LLC ("Blue Canopy") and that company's successor-in-interest Jacobs Engineering Group, Inc. ("Jacobs" and with Blue Canopy, "Counter-Defendants"):

### INTRODUCTION

1. Counter-Plaintiffs bring this Counterclaim to establish that prior to depositing the "$1,933,500 Fund" (as defined in Counter-Defendants' Complaint in this matter) with the Court, Counter-Defendants converted the same and were unjustly enriched thereby and accordingly are liable to Counter-Plaintiffs for damages resulting from the same, including but not limited to pre-judgment interest as described herein.

### PARTIES AND VENUE

2. Plaintiff IRT is an irrevocable grantor trust established by grantor and plaintiff Capefirst under the laws of the Commonwealth of Virginia, pursuant to a Declaration of Trust dated August 1, 2017. The trustee, Capefirst Advisors, LLC, is a Virginia limited liability company. The beneficiaries of the trust are investors who provided funds to grantor Capefirst for the sole purpose of such funds being advanced to Blue Canopy in connection with the invoice financing described herein. Under the Declaration of Trust (the "Declaration"), Capefirst conveyed its rights of recovery under this litigation, and other rights associated with the matters described herein, to IRT. Pursuant to provisions of the Declaration, the grantor is permitted to direct the distribution of any assets remaining after the beneficiary payments listed in the Declaration have been distributed by the trustee; hence, Capefirst retains standing as a plaintiff in this litigation.

3. Plaintiff Capefirst is a limited liability company organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Reston, Virginia. Capefirst provides, among other things, commercial and business financing services, including

financing secured by contracts awarded to, and invoices issued by, government contractors, among them service-disabled veteran-owned small businesses.

4. Defendant Blue Canopy is a limited liability company organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Reston, Fairfax County, Virginia. At the time of the matters described herein, Blue Canopy held itself out as, among other things, a provider of mission support and other services to the Federal Government's defense and intelligence agencies.

5. Upon information and belief, defendant Jacobs is successor in interest to Blue Canopy, having acquired the Blue Canopy business in a transaction announced publicly on August 31, 2017. Further upon information and belief, Jacobs escrowed a portion of the consideration paid for Blue Canopy in order to cover prospective claims and liabilities arising from Blue Canopy's activities prior to the Jacobs purchase, such as the claims and liabilities set forth in this Counterclaim.

**FACTS COMMON TO ALL COUNTS**

**<u>The Blue Canopy Matter</u>**

6. Non-Parties Garrison Courtney and Virgil Keith are individuals who held themselves out as employees or contractors of Blue Canopy. Courtney's and Keith's relationship with Blue Canopy gave them access to Blue Canopy personnel and facilities. They were assigned Blue Canopy e-mail addresses and credentials. Keith was observed by a former Capefirst client representing Blue Canopy in Blue Canopy exhibit space at a trade show.

7. At the time of the matters described herein, Courtney and Keith, together with a government official named Eileen K. Preisser ("Preisser") claimed to be officially representing the

interests of the United States intelligence and defense communities with regard to certain classified government programs that involved Blue Canopy and other companies (the "Programs").

8. Courtney and Keith, together with Preisser, solicited and subsequently arranged with a principal of Westfields, a Virginia limited liability company, funding for the benefit of Blue Canopy in the amount of $1,933,500 (the "Funding Amount"). As used henceforth in this complaint, the term "Blue Canopy Transaction" shall refer to payment of the Funding Amount to Blue Canopy, and all events and documents leading up to it.

9. Westfields, a privately-owned firm with knowledge of the Programs and potential access to funds in the solicited amount, was approached by Courtney and offered an opportunity to provide the Funding Amount. Courtney promised that the repayment amount would include compensation for delivery of the temporary funding as well as for uncompensated advisory work that had been performed by Westfields in connection with the Programs.

10. Courtney and Keith, and also Preisser, represented to Westfields that acquisition of the Funding Amount would help facilitate a secret, time-sensitive initiative being orchestrated by the United States Department of Justice to seize control of Blue Canopy (the "BC Initiative") from senior executives of Blue Canopy due to instances of malfeasance, including violations of Federal law, by senior executives of the company. Westfields was not given the names of individuals within the Department of Justice who were allegedly directing the BC Initiative.

11. Westfields was informed by Courtney, Keith and Preisser that (a) the BC Initiative had importance for national security because of the sensitive nature of some of Blue Canopy's work for the intelligence community, (b) temporary funding from a private source was being solicited due to the time-sensitive nature of the BC Initiative, (c) the Funding Amount was to be paid to Blue Canopy in settlement of an ongoing payment dispute between Blue Canopy and the

U.S. Government, the amount of such settlement having been negotiated by government officials, and (d) settlement and payment over the dispute were pressing matters because Blue Canopy executives sought to exploit the dispute to delay or block the BC Initiative.

12. To secure Westfields' participation, Courtney and Keith, together with Preisser, promised to requisition the needed funding by arranging for the award of a government contract to Westfields (the "Contract") providing for a payment of $2,555,380 (the "Contract Proceeds") representing a return of the requisitioned funds plus the compensation.

13. Courtney and Keith informed Westfields that the funds were required by November 5, 2015, and that the Contract Proceeds would be paid within 10 to 30 days following the date Westfields delivered its invoice in accordance with instructions provided, such invoice to be sent following delivery of the Funding Amount to an escrow account maintained by Tucker & Associates, PLLC, a law firm.

14. Prior to execution of the Contract, the BC Initiative and its associated funding requirement were discussed at multiple meetings attended by combinations of Matthew Milstead, (the principal of Westfields), Courtney and Keith, Preisser, and Eric Husebo ("Husebo"). Husebo was a Blue Canopy senior executive and shareholder/member when the meetings occurred and until after the sale to Jacobs.

15. Most of the meetings that pertained to the BC Initiative were held at the National Geospatial-Intelligence Agency ("NGA") in Springfield, VA. The NGA facility is considered a SCIF, or Sensitive Compartmented Information Facility. A SCIF is an office/meeting space certified by the U.S. Government for use by government and contractor personnel in the defense and intelligence communities to enclose security-sensitive communications and house documents carrying high-level security classifications.

16. By using the NGA SCIF for these meetings, Courtney and Keith imparted an aura of authenticity to the Contract and created the impression that the BC Initiative, the Contract, and the funding transaction arising therefrom were sanctioned by the United States Government.

17. In October 2015, Courtney and Keith met with Westfields principal Milstead for the purpose of executing the Contract. At this meeting, Milstead and a credentialed individual representing himself to be a government contracting officer executed the Contract in the presence of Courtney and Keith.

18. Milstead was not permitted to retain a copy of the executed Contract, which carried Department of Defense identifiers and inscriptions, because, as explained by Courtney, Westfields did not possess a "Facility Clearance" commonly required for the storage of security-classified documents. Rather, Courtney took possession of the executed contract, and informed Milstead that the document would be placed in a locked safe with other contracts similarly awarded.

19. The contract signing occurred at the offices of Riverside Research ("Riverside") in Arlington, VA. Riverside is a not-for-profit government contractor and "think tank" known to perform assignments for military and intelligence agencies.

20. Courtney and Keith had unfettered access to Riverside's facility pursuant to their work for and with Blue Canopy and other entities. This signing location and the presence of an individual credentialed as a government contracting officer imparted an aura of legitimacy to the Contract.

21. On or about October 30, 2015, following a demand by Capefirst that Westfields produce written evidence of its Contract award prior to release of funds by Capefirst, Keith personally delivered to Milstead, who subsequently delivered to Capefirst, an unclassified <u>Notification of Award</u> ("Notification") printed on Department of Defense stationery. Delivery of

this document occurred in the NGA facility in Springfield, VA, to which Courtney and Keith had unfettered access pursuant to their work for and with Blue Canopy and other entities.

22.    The Notification was mechanically executed by an individual who signed as a Contracting Officer for the Department of Defense. Courtney, Keith and Blue Canopy managed the issuance of the Notification, including the place and manner of its delivery, so as to impart an aura of legitimacy and official action to the Contract. The Notification appears as Exhibit 1.

23.    The meetings and documents cited in this complaint were carefully orchestrated to impart, and did impart, an aura of legitimacy attributable to the secured surroundings in which the meetings took place and the presence of government employees.

24.    The meetings were part of a ruse perpetrated to reassure Capefirst, through Westfields, that the BC Initiative, the Blue Canopy Transaction, and the Defendants (and Courtney and Keith) were legitimate in all respects.

25.    Blue Canopy was aware of the materially false nature of the representations made by with respect to the Blue Canopy Transaction, and knowingly allowed these representations to be made.

26.    Upon information and belief, Blue Canopy knew or had reason to know at all times that the Contract and its receipt of the Funding Amount were illegitimate and fraudulent and part of a scheme to defraud Counter-Plaintiffs.

**Capefirst Funded the Blue Canopy Transaction**

27.    Courtney and Keith were aware that the Funding Amount was being provided by Capefirst in connection with the Contract awarded to Westfields.

28.    Courtney and Keith directed that monies advanced by Capefirst under the Contract be paid to an escrow account administered by Tucker & Associates PLLC (the "Tucker Firm").

29. Capefirst and the Tucker Firm entered into a confidential escrow agreement dated November 5, 2015 (the "Escrow Agreement"). The Escrow Agreement stipulated that Capefirst would deposit the Funding Amount into a bank depository account maintained by the Tucker Firm, for subsequent transfer to an account under Blue Canopy's control.

30. On November 5, 2015, Capefirst deposited into the Tucker Firm escrow account, by wire transfer, the Funding Amount. A copy of a bank record confirming the Capefirst transfer is attached as Exhibit 2.

31. Thereafter, Westfields delivered an invoice for the Contract Proceeds, in full compliance with the requirements of the Contract and additional instructions received from Courtney.

32. On November 6, 2015, the Tucker Firm transferred the escrowed funds in full to an account controlled by Blue Canopy at Wells Fargo Bank. A copy of a bank record confirming the wire transfer to Blue Canopy is attached as Exhibit 3.

33. Thereafter, Capefirst and Westfields made repeated inquiries to Courtney, Keith, Preisser, and others about the status of the Contract Proceeds, and each time received false assurances that the payment was in process or only temporarily delayed.

34. Counter-Plaintiffs later learned that the Funding Amount was received into a segregated "Special Account" maintained by Blue Canopy at Wells Fargo Bank, which was otherwise substantially empty. The Funding Amount sat undisturbed in the Special Account until April 2016, when it was transferred to Blue Canopy's operating account. At the same approximate time as the Funding Amount was transferred by Blue Canopy to its operating account, the principal officers of Blue Canopy received hundreds of thousands of dollars in disbursements from the operating account.

35. As of the date of this Counterclaim, neither Capefirst nor IRT has received the Contract Proceeds, and by its representation, Westfields has not received any Contract Proceeds. Attempts to recover the Funding Amount from Defendants have not been successful.

36. Courtney and Keith acted for themselves and as agents for Blue Canopy with respect to the matters set forth in this Counterclaim.

37. On July 28, 2016, Capefirst made written demand on Blue Canopy for repayment of the Funding Amount. In addition, Capefirst requested that the Funding Amount be escrowed pending resolution of Capefirst's demand for repayment. Blue Canopy ignored Capefirst's demands and requests, electing instead to wrongfully retain the Funding Amount.

38. Capefirst and the beneficiaries of IRT have suffered substantial harm, including but not limited to significant reputational damage and forfeiture of opportunities, as the direct result of the Defendants' materially false representations regarding the Blue Canopy Transaction and Blue Canopy's failure to repay the Funding Amount.

39. Upon information and belief, a purpose of the transaction by which Jacobs acquired Blue Canopy was to frustrate Counter-Plaintiffs' recovery in this dispute, such dispute having been repeatedly brought to the attention of Blue Canopy and its outside counsel.

40. Counter-Plaintiffs expressly preserve all claims and rights with respect to these matters, including claims against third parties known and not known to Counter-Plaintiffs who are found to have, or are suspected of having, knowingly abetted, accommodated and/or illicitly or unjustly benefited from the Blue Canopy Transaction, as may be revealed during discovery or through other means, including claims against existing and former officers and members of Blue Canopy and its successor in interest.

## COUNT I

### (UNJUST ENRICHMENT AGAINST COUNTER-DEFENDANTS)

41. Counter-Plaintiffs incorporate each of the averments of the foregoing paragraphs of this Complaint as if such averments were set forth in full and at length in this Count I.

42. Capefirst advanced the Funding Amount to Blue Canopy on November 5, 2015.

43. Capefirst conferred a benefit upon Blue Canopy in the amount of $1,933,500.00.

44. Counter-Defendants were aware of, and had knowledge of, the benefits conferred upon them by way of the Funding Amount advanced, and were aware that such benefits were illegitimately and unjustly obtained.

45. Counter-Defendant Blue Canopy failed and refused, despite demand, to repay the Funding Amount to Capefirst.

46. Counter-Defendants' acceptance and retention of the Funding Amount while they had knowledge of the benefits conferred upon them make it inequitable for them to retain these benefits without payment of their value to Counter-Plaintiffs.

WHEREFORE, Counter-Plaintiffs respectfully request that this Court enter orders:

A. Granting judgment in their favor and against the Counter-Defendants in the amount of $1,933,500.00, plus prejudgment interest, reasonable attorneys' fees, interest, costs of this action, and other expenses incurred by Counter-Plaintiffs in enforcing their rights; and

B. Granting such other and further relief as this cause may require.

## COUNT II

### (CONVERSION AGAINST COUNTER-DEFENDANTS)

47. Counter-Plaintiffs incorporate each of the averments of the foregoing paragraphs of this Counterclaim as if such averments were set forth in full and at length in this Count II.

48. Counter-Plaintiffs are the owners of the Funding Amount advanced to Blue Canopy.

49. No Counter-Defendant has any right, title, claim or interest in and to the Funding Amount.

50. No Counter-Defendant is entitled to assert any statutory lien or other claim against the Funding Amount.

51. The Counter-Defendants' unjust retention of the Funding Amount and refusal to turn over the Funding Amount to Counter-Plaintiffs after demand is an intentional and unlawful exercise of ownership, dominion and control by the Counter-Defendants over Counter-Plaintiffs' property and Counter-Plaintiffs' interest in the Funding Amount, and constitutes the Counter-Defendants' denial and repudiation of Counter-Plaintiffs' right to immediate and final possession of the Funding Amount.

52. The Counter-Defendants knew or should have known that they did not own or have any claim to possession of the Funding Amount at the time any of them came into possession thereof. Despite this, the Counter-Defendants refuse to return the Funding Amount to Counter-Plaintiffs.

WHEREFORE, Counter-Plaintiffs respectfully request that this Court enter orders:

A. Awarding to Counter-Plaintiffs compensatory damages for the conversion of the Funding Amount, and entering judgment in its favor and against the Counter-Defendants in the amount of $1,933,500.00, plus prejudgment interest, reasonable attorneys' fees, interest, costs of this action, and other expenses incurred by Counter-Plaintiffs in enforcing their rights in connection with the matters set forth herein; and

B.  Granting such other and further relief as this cause may require.

Dated:  January 31, 2019

Respectfully submitted,

/s/ Pierce C. Murphy
Jodie E. Buchman (VSB No. 91929)
Pierce C. Murphy (VSB No. 87842)
Silverman|Thompson|Slutkin|White|LLC
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201
(410) 385-2225 telephone
(410) 547-2432 facsimile
jbuchman@mdattorney.com
pmurphy@mdattorney.com

Attorneys for Capefirst Funding, LLC and Investor Recovery Trust, Capefirst Advisors, LLC, Trustee

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of January, 2019, a copy of the foregoing Answer and Counterclaim was electronically filed with the Clerk of the Court by using the CM/ECF system, which will furnish electronic copies to all counsel of record.

Dated: January 31, 2019                    /s/ Pierce C. Murphy